## THE CALEB HALEY.
No. 1911–KA.

District Court of Alaska. First Division. Ketchikan.
May 18, 1937.

Ziegler & King, of Ketchikan, for libelant.

W. C. Arnold and Harry McCain, both of Ketchikan, for intervenor New England Fish Co.

ALEXANDER, District Judge.

This is a libel in rem, addressed to the Admiralty side of the court by S. F. Iman, the Libelant, v. The Oil Screw "Caleb Haley", her engine, tackle, etc., in behalf of himself and all others, entitled—for salvage growing out of circumstances alleged to have occurred on the night of August 4th, 1936, and the early morning of August 5th, 1936, in the vicinity of Security Cove in southeastern Alaska.

It appears that on the night of August 4th, 1936, while the "S. F. Iman" was lying at anchor in Security Cove, the attention of her master was called to distress signals apparently coming from a ship at sea. In response to said distress signals the "S. F. Iman" lifted anchor immediately and proceeded to answer the call. After leaving the harbor the master of the "S. F. Iman" sighted a vessel lying in the waters of the North Pacific Ocean at a point some two hundred yards south of the reef located on the south side of the entrance to Security Cove and about one mile distant from the entrance, When the. "S. F. Iman" approached within speaking distance of this vessel she proved to be the "Caleb Haley", a cannery tender owned and operated by the New England Fish Company. The "Caleb Haley" was then adrift in a helpless condition, with her stern awash, her engines stopped and unable to re-start, her engine room flooded and her crew standing by on deck with life belts on and some with boots or shoes off, ready to abandon the ship at any moment. The tide was flooding, a fresh south by southeast wind was blowing, and heavy seas were running outside. The vessel was at the mercy of

the wind and sea, full of water in the stern and was taking water faster than the men on board could pump it out, her power pump having already been disabled, leaving the hand pump the only means for pumping her out, and the vessel drifting helplessly toward the reef and the adjacent shore.

The waters in which the "Caleb Haley" was adrift when the "S. F. Iman" proceeded to her rescue, are the open waters of the North Pacific Ocean, and Security Cove, which is located on the westerly side of Dall Island, is the only refuge or safe anchorage in that vicinity. The coast line on the west side of Dall Island is, according to the testimony of all the witnesses, admittedly extremely rough, rocky and precipitous and any vessel adrift in the near vicinity of that shore line would be in imminent danger of being broken up and lost, and it would have been extremely difficult for even the crew to have landed safely in any small boat such as was available to the crew of the "Caleb Haley."

The evidence also shows that the night was dark and misty, the seas were rough, with heavy swall running; the tide was flooding and a stiff southeast wind was blowing, all of which added to the imminent peril of the "Caleb Haley" and her crew and the difficulty of rescue by the "S. F. Iman."

It was under these conditions that the "S. F. Iman" went to the rescue of the "Caleb Haley". As soon as the "S. F. Iman" arrived within speaking distance the master of the "Caleb Haley" requested assistance and that his vessel be taken in tow. To this the master of the "S. F. Iman" assented and proceeded to make fast to the "Caleb Haley", which he accomplished after maneuvering about her. The said necessary maneuvering, in making a line fast to the "Caleb Haley", required a high degree of skill and was attended with considerable risk of collision and danger from the seas and tides to the lives of those aboard the "S. F. Iman". The "S. F. Iman" did take the "Caleb Haley" in tow and proceeded with her to Security Cove

which was the nearest available refuge where she was safe from the wind and sea, and on arrival there the "Caleb Haley" was beached, pumps were rigged up and placed aboard the salvaged vessel and pumping commenced and continued uninterruptedly until about eight or nine o'clock the following morning when the vessel was pumped dry.

The following morning about 10 o'clock the "S. F. Iman" again took the "Caleb Haley" in tow, with the assent of her master and, after some difficulties en route which are inconsequential so far as the issues of this case are concerned, towed her to Ketchikan to the dock of her owner, the New England Fish Company, and turned her over to it.

The evidence is overwhelming that at the time the "S. F. Iman" came to her rescue the "Caleb Haley" was in an utterly helpless condition and adrift and in imminent danger of being carried onto the reef at the south entrance to Security Cove or the adjacent shore and becoming a total loss. The entire after end of the vessel up to the housing was completely submerged. She was shipping water over her stern, her hold and engine were flooded, her engine was disabled and stopped and subsequent efforts showed it in such condition that it could not again be started; her crew, at her captain's orders, were on deck with life preservers on and some with shoes and boots off, ready to abandon the vessel at any moment. That there were two skiffs and a dory aboard the "Caleb Haley" but one skiff had already been broken up by the seas until it was unseaworthy; that the dory was on top of the housing and the plug therefor lost or misplaced and it would have been extremely perilous, if not impossible, for the crew to have saved themselves by the use of either the remaining skiff or the dory. The evidence further shows that immediately upon the "S. F. Iman's" arrival the master and crew of the "Caleb Haley" implored the aid of the "S. F. Iman" and after taken in tow called frequently for the "S. F. Iman" to hurry, that they were sinking, and to get them into the cove as quickly as possible. That upon their arrival in the cove

both the master and crew of the "Caleb Haley" went to the master of the "S. F. Iman" and thanked him fervently for saving their lives and their ship; and this is undenied by either the master or crew of the "Caleb Haley."

The uncontradicted testimony also shows that at the time the "Caleb Haley" called for help there were a dozen or more other ships lying at anchor within security Cove, some of which were much larger and more powerful than the "S. F. Iman" and that none of them, although equally able to hear the distress signals of the "Caleb Haley", helped or tendered their help toward the rescue of the "Caleb Haley".

The evidence is also clear and convincing that the seas outside the cove were rough and dangerous on that night, and this is particularly borne out by the testimony of Everett Hudson, a thirty-nine year old native fisherman, the owner of the "Elinor", a 52 foot boat, who had been fishing since he was twelve years old,—who said that he was on the east side of Dall Island on his way to Security Cove on that night and about the time the accident in question occurred. He arrived in the vicinity of the southern point of the island, that he found the sea so rough and the weather so bad that he found it necessary to, and did, run to cover near Cape Muzon at the southerly tip of Dall Island at the point marked "A" on Claimant and Cross-Libelant's Exhibit number "1" and spent the night there; and this dangerous weather probably accounts for the reason why other ships then lying in Security Cove did not go to the rescue of the "Caleb Haley." I want to mention here that the uncontradicted testimony shows the "Caleb Haley" had blown distress signals until her air was entirely exhausted, her whistle useless, which rendered her unable to further call for assistance, and made her condition even more perilous and her danger more imminent.

There are no close or complicated questions of law involved in the case, and I therefore refrain from discussing the law of the case or citing any authorities. The case is,

to my mind, a clear one of salvage, and I have treated it as such, based upon the evidence as I view it, with due regard to the principles of law involved governing such matters.

The Court therefore finds that the work of extricating the "Caleb Haley" and her crew of five men from this situation was a salvage operation and required skillful seamanship on the part of the "S. F. Iman", and that the service so rendered by the "S. F. Iman" was perilous and with danger to that vessel and her crew and was performed efficiently, expeditiously and without loss of or damage to said salvaged vessel, and that thus the "Caleb Haley" was saved to its owner, and that without such help the "Caleb Haley" would undoubtedly have set on the reef at the entrance to Security Cove or been thrown upon and against the adjacent shoreline and would have sunk before reaching a place of safety, and that the lives of her master and crew, or some of them, might have been lost.

The Court further finds that the value of the "S. F. Iman" at the time the services were rendered as aforesaid was $7,500 and that the value of the "Caleb Haley" at the time of said accident was $12,000, and that the master of said "Caleb Haley" had $1,000 or more aboard the "Caleb Haley" at the time of said rescue.

The Court further finds that the evidence is insufficient to prove that the "Caleb Haley" suffered any damage while being towed from "Security Cove" to Ketchikan.

The Court further finds that the damages to the "Caleb Haley" by reason of her partial submersion prior to and at the time of said rescue and the bills allowable therefor, as shown by the proofs, are as follows:

| | |
|---|---|
| Axel Osberg—marine survey | $50.00 |
| Smith Electric Company, repairs to electric equipment | 75.88 |
| Northern Machine Works—for overhauling engine, etc., made necessary by salt water damage, including towing, etc. | 525.62. |
| a total of | $651.50. |

The Court further finds that the reasonable value of towing the "Caleb Haley" by the "S. F. Iman" from Security

116

Cove to Ketchikan is $150 and that the damage done to the hawser used by the "S. F. Iman" in said operation is $50.

The Court therefore finds that the libelant is entitled to recover twenty-five per cent (25%) of the then value of the "Caleb Haley", hereby fixed at $12,000 plus $1,000 found to be the money on board, or twenty-five per cent (25%) of $13,000, equal to $3,250 plus a towing charge of $150 and damage to her hawser of $50 or a total of $3,450 less the damages incident to the partial submersion of the "Caleb Haley" of $651.50, making a net recovery to the libelant of $2,798.50, to be divided as follows:

Eighty per cent (80%) thereof to the owner of the vessel, and

Twenty per cent (20%) to her crew, to be equally divided between them, together with libelant's costs and six per cent (6%) interest on the net amount found due, from August 6, 1936.